| 92 | 187 |
|---|---|
| 100 | 492 |
| 101 | 156 |
| 101 | 498 |
| 102 | 630 |

| 92 | 187 |
|---|---|
| 103 | 169 |

| 92 | 187 |
|---|---|
| 109 | 334 |

| 92 | 187 |
|---|---|
| 114 | 501 |

| 92 | 187 |
|---|---|
| 125 | 806 |

# Birmingham Mineral Railroad Co. *v.* Jacobs.

*Action against Railroad Company for Damages, by Administrator of Person Killed.*

1. *Statutory provisions as to railroads crossing each other.*—Under statutory provisions, when the tracks of two railroads cross each other, engineers and conductors are required to stop their trains within one hundred feet of the crossing, "and not proceed until they know the way to be clear" (Code, § 1145); and the fact that such stoppage, within one hundred feet, will leave the cars in the rear standing on the crossing of another railroad, does not excuse the failure to perform this duty.

2. *Averment of willful injuries causing death; variance.*—In an action by an administrator, to recover damages for injuries which caused the death of his intestate, a count which avers that the defendant railroad company, "by and through its conductor, engineer," &c., "negligently, wantonly, recklessly, and willfully caused and permitted its said train to run into and against said [dummy] engine on which plaintiff's intestate was," thereby causing the injuries which resulted in his death, is an averment that the injuries were willfully caused, and does not authorize a recovery on proof of mere negligence; but a count which avers that the defendant's train was willfully run at a high rate of speed, "towards and to said crossing" at which the dummy-engine was, is not equivalent to an averment that the collision was willfully caused.

3. *Statutory provisions as to railroads crossing each other.*—The Ensley Railway Company, organized under the provisions of the act approved February 25th, 1887 (Sess. Acts 1886-7, p. 144), and engaged in operating a railroad between Ensley City and Birmingham with dummy-engines, is a railroad within the terms of the statute (Code, § 1145) which requires trains on railroads which cross each other to stop within one hundred feet of such crossing. (STONE, C. J. and CLOPTON, J. dissenting.)

APPEAL from the Circuit Court of Jefferson.

Tried before the Hon. JAMES B. HEAD.

This action was brought by the appellee, Hannah Jacobs, as administratrix of the estate of Peter Jacobs, against the appellant corporation; and sought to recover damages for the alleged negligent killing of her intestate. The injuries which resulted in the death of plaintiff's intestate, occurred at the crossing of the defendant's track with the track of the Ensley Railway Company, which latter company is what is known as a dummy railroad. The deceased was the engineer and had charge of the dummy engine of the Ensley Railway at the time of the accident. The injury was caused by the collision of the de-

fendant's train of cars, which was backing, with the dummy-engine at the said crossing of the two roads. The complaint contains three counts. The first count alleges that the defendant, through its conductor, engineer, servants or agents, negligently, wantonly, recklessly, and willfully caused, permitted and suffered the said train to run into and against the engine upon which plaintiff's intestate was at his post of duty, whereby said dummy engine was knocked off the track, and plaintiff's intestate was so scalded, bruised and wounded as that he died in consequence thereof. The second count alleges that the death of plaintiff's intestate was caused by defendant's employès, who were in charge of defendant's train, negligently, recklessly failing to come to a full stop within 100 feet of the said crossing of the two roads; and negligently and recklessly proceeding before they knew the way to be clear; and negligently, recklessly, wantonly and willfully running said train and engine towards said crossing at a high rate of speed, striking the dummy engine upon which plaintiff's intestate was stationed, and thereby knocking it off the track, and causing the injuries of which plaintiff's intestate died. The third count alleges the same facts of negligence which are alleged in the two preceding counts, and, in addition thereto, that the train of defendant was being backed, without defendant's employès keeping a proper lookout. This count does not allege that the death of plaintiff's intestate was caused by any negligence, wantonness, or willfullness on the part of defendant's servants who were in charge of its engine and train.

The uncontroverted evidence showed that the train of the defendant could not have been stopped within 100 feet of the track of the Ensley Railway, without leaving a portion of its train across the main line of the Kansas City, Memphis and Birmingham Railway, which latter road was 325 feet from the Ensley Railway, measured along the line of the defendant's road—the evidence showing that the defendant's train consisted of 14 cars besides the engine and tender. The evidence for the plaintiff tended to show that the defendant's train stopped within 300 or 400 feet of the Kan. City, Mem. & Bir. Railroad track, and then proceeded across said track, without stopping until after the collision with the Ensley Railway dummy. There was evidence for the defendant tending to contradict this testimony; but the conductor, who was on the defendant's train, at the time of the accident, testified that the said train did not stop between the Kan. City, Mem. & Bir. track and the Ensley Railway track. The evidence further showed that there was a long train of cars passing along the track of the Georgia Pacific Railway Company, which ran

parallel with defendant's railroad at this point, and within about 56 feet thereof; that the dummy train of the Ensley Railway, upon the engine of which plaintiff's intestate was, came by from the direction of the Ga. Pac. Railroad, while its train was passing across the track of the Ensley Railway Co.; that the said dummy stopped within a few feet of the said Ga. Pac. road, to wait until its train had cleared the track, and then started across the track of the Ga. Pac. R. R. Co. in the direction of the defendant's track. The evidence was in conflict as to where the defendant's train was at the time the dummy train of the Ensley Railway started across the Ga. Pac. track—the testimony for the defendant tending to show that the caboose, which was at the rear end of its train, was at that time within a short distance of the crossing of the dummy line—and there was testimony tending to show that as soon as the peril of plaintiff's intestate was discovered, the defendant's employès and servants did all in their power, with the means at hand, to avoid the injury.

The court, in his general oral charge to the jury, presented all the principal questions discussed in the opinion of this court, on this appeal, construing the dummy line as a railroad, within the meaning of the statutes of this State. The defendant separately excepted to several portions of the court's oral charge, and also separately excepted to the court's refusing to give each of the following charges asked by it ·in writing: (1) "I charge you that if the defendant's train of cars could not have been stopped within 100 feet of the dummy track or crossing, after crossing the Kan. City, Mem. & Bir. Railroad Company's track without leaving some of its cars across the said track of the Kan. City, Mem. & Bir. R. R. Co.'s track, then a failure to stop would not have been negligence, unless the defendant's servants connected with said train saw the peril of plaintiff's intestate, or could have seen it by the exercise of such care as a prudent man would have exercised under like circumstances, in time to have avoided the injury." (2) "That if the jury believe all the evidence in this case, they must find for the defendant, under the pleadings in this case." (3) "That statute requires engineers running trains to stop their trains within 100 hundred feet of railroad crossings, before attempting to cross the same, and a failure to do so is negligence; but the law will not require an observance of this statute, where by so doing any part of the train would be necessarily across the track of another railroad." (4) "I charge you, that under the facts as shown in this case, the defendant was not guilty of any negligence, and in its failure to observe the requirements of the statute in stopping its

[Birmingham Mineral Railroad Co. v. Jacobs.]

train within 100 feet of the dummy track, as the evidence shows that by so doing a part of the. train would have been left across the track of the Kansas City, Mem. & Bir. Railroad Co.; but if the servants of defendant saw the peril of plaintiff's intestate, or by the exercise of due care, could have seen it, that is such care as a prudent person would have exercised under like circumstances, in time to have avoided the injury, the law would have required the servants of defendants to have used all the means at their command to have stopped the train." (5) "Unless the jury believe from the evidence, that the injury to plaintiff's intestate was inflicted recklessly, wantonly, or willfully by defendant's servants managing and running its train, they must, under the pleadings in this case, find for the defendant." (6) "If you believe the evidence, you must find for the defendant under the first count of the complaint." (7) "If you believe the evidence, you must find for the defendant under the second count of the complaint." (8) "That the law does not require the defendant to stop its trains at the crossing of the dummy line of the Ensley Railway."

There was judgment for the plaintiff; and the defendant prosecutes this appeal, and assigns as error the general oral charge of the court, and the refusal of the court to give each of the charges requested by the defendant.

HEWITT, WALKER & PORTER, for appellant.—The court erred in refusing to give the charges asked by defendant.—*L. & N. R. R. Co. v. Webb*, 90 Ala. 185; *L. & N. R. R. Co. v. Johnson*, 79 Ala. 436.

BOWMAN & HARSH, *contra.*—The court did not err in its rulings upon the charges.—64 N. Y. 532; 47 N. Y. 400; 35 N. Y. 75; 41 Ohio St. 565; 58 Iowa, 150; 43 *Ib.* 109; 19 Am. & Eng. R. R. Cas., 305; 8 *Id.* 273; Sherman & Redfield on Neg., § 31.

STONE, C. J.—The intestate of plaintiff in the court below, Peter Jacobs, was in charge, as engineer, of a dummy engine and train of two cars, which was making a trip over the dummy line between Birmingham and Ensley City. The track of that line crosses the track of the appellant corporation, and at the crossing, intestate, while at his post of duty, was struck and killed by a train which was being pushed backward over the track of the Birmingham Mineral Railroad Company. The suit is against the railroad corporation, and charges that the collision and injury resulted from the negligence of the Birmingham Mineral R. R. Company. Possibly the most important charge of negligence consists in the

alleged fact that the train of the Birmingham Mineral was not brought to a full stop within one hundred feet of the crossing of the railroad and dummy tracks.—Code of 1886, § 1145. One defense to the action is contributory negligence. The trial court, in its rulings, treated the dummy line as a railroad within the meaning of section 1145 aforesaid. There was a recovery in favor of the plaintiff.

It is contended for the appellant corporation that a dummy line is not a railroad within the meaning of the statute, and that, therefore, it owed no duty to bring its train to a full stop before crossing the dummy track. If this point be well taken, there can be no question that the Circuit Court erred in several of its rulings. But, as we do not intend to consider this question until we shall have disposed of the other questions raised, we need say no more on this point at this place.

Moving in the direction the appellant's train was coming, it would first encounter, and must needs cross the main track of the Kansas City, Memphis & Birmingham Railroad Company. Between that track and the track of the dummy line, is a space of only three hundred and twenty-five feet. The approaching train consisted of fourteen cars besides the engine and tender—much longer than the space between the two tracks. The uncontroverted testimony is, that if the train had stopped at any point within one hundred feet of the dummy track, its rear section would have overlapped the track of the Kansas City, M. & B. by four or five car lengths—more than one hundred feet. This, it is contended, must operate an exception to the statutory requirement, and relieve the railroad company from the duty of stopping before crossing the second track.

The statute in question is a very wise and humane exercise of the State's police power. It is of very easy observance, and if faithfully and thoughtfully conformed to, no such thing as a collision of trains at a railroad crossing could occur. Each train must come to a full stop, within one hundred feet of the crossing, before attempting to cross. It must not only be brought to a full stop, but it must "not proceed until they know the way to be clear." The statute then declares which road shall have the preference in crossing; the one having "the older right of way." So, the duty of learning that the way is clear before proceeding, is equally as binding as is the command to come to a full stop. The purpose of the required stop is, that the situation may be taken in. And if the officer or agent, having control of a train, were merely to go through the perfunctory ceremony of coming to a stop, and were then to proceed without informing himself that the way is clear, he

would be as derelict in duty as if he had not brought his train to a stop.

We can not adopt the interpretation contended for. It is not within our province to disregard so positive language of the legislature, nor do we think policy points in that direction. To disregard the statute is to make collisions possible, if not probable. To obey it, is to render them impossible. If it were made a highly penal offense in all persons controlling trains, who fail to observe this statutory enactment, such collisions would probably be much less frequent.

The first count of the complaint charges that the defendant, "by and through its conductor, engineer, servants and agents. negligently, wantonly, recklessly and wilfully caused, permitted and suffered its said train to run into and against the said engine upon which plaintiff's intestate was, as aforesaid, knocking it off the track, and so scalding, bruising and wounding plaintiff's intestate that he died in consequence thereof." This count in terms charges that the defendant's train was *wilfully caused* to be "run into and against the said engine" of the dummy line. There is no testimony tending to show that the collision was "wilfully caused" by defendant's servants, but the trend of the whole testimony repels such inference. The defendant's sixth charge (which was refused), was confined to the first count of the complaint, and, in effect, asserts that the plaintiff failed to establish the truth of that count. This is the identical question which was raised and ruled on in *Johnston's case,* 79 Ala. 436. While the point may be somewhat technical, we do not feel at liberty to depart from the ruling then made. The sixth charge asked ought to have been given. *Dickson's case,* 88 Ill. 431 ; 1 Greenl. Ev., §§ 51, 63 ; *Coulton's case,* 86 Ala. 129 . *Guinan's case,* 47 Amer. Rep. 279.

The second count does not charge that the defendant wilfully caused the collision. The charge is that the train was wilfully run at a high rate of speed "towards and to said crossing." This is an entirely different question, which does not fall within the rule declared in *Johnston's case, supra.*

We recur to the question first raised : Was the Ensley Railway a railroad within the meaning of section 1145 of the Code of 1886 ? Was its track such an one, as that, before crossing it, the train of the defendant railroad must be brought to a "full stop," with no authority to proceed until those having it in charge knew the way to be clear ? This question, it would seem, does not necessarily depend on a partial resemblance of the Ensley Railway to railroads proper. It depends on the will and intention of the legislature, to be gathered

from its language.　Much light will be shed on this subject by tracing our legislative history which bears upon it.

. The clause which now constitutes section 1145 of the Code of 1886, was enacted December 10, 1864. (Sess. Acts, 1864–5, p. 77). That clause has undergone no change since its enactment, with this exception : When first enacted, the train was required to be brought to a full stop within fifty feet of every railroad crossing. The Code of 1886, § 1145, fixes the maximum of the distance at one hundred feet. There is much testimony tending to show that the train .on The Birmingham Mineral Railroad Company which collided with the dummy engine, of which deceased was the engineer, was not brought to a full stop within one hundred feet of the track of the Ensley Railway. So, if the Ensley Railway was at the time of the collision—February 22, 1889—a railroad within the meaning of the statute, the jury were not without testimony on which to find that that feature of plaintiff's case was made good.

Our statutory provisions in reference to the government, regulation and supervision of railroads have been of steady growth, dating far beyond the introduction of dummy engines as tractors of street cars. They are embodied in the Code of 1886, commencing with section 1120, and ending with section 1173. The whole of chapter 2, title 12, part 1 of the Code is devoted to this subject. What is now section 1144 of the Code of 1886, was enacted February 6, 1858. (Sess. Acts, p. 15). It constitutes section 1399 of the Code of 1867, and section 1699 of the Code of 1876. Section 1145, as we have seen, was approved December 10, 1864. In the Code of 1867 it is § 1403, and in the Code of 1876, § 1702. On December 29, 1868—Sess. Acts, 462—the law was approved requiring railroad companies to erect at each crossing of a public road a sign "with large and distinct letters," giving notice of the proximity of the railroad, &c. This statute is embodied in section 1722 of the Code of 1876, and is section 1146 of the Code of 1886. One provision of the act approved December 10, 1864, requires that "the chief superintendent of every railroad shall instruct the engineers and conductors thereof as to the provisions of" what now are sections 1144, 1145 of the Code of 1886. Code of 1867, § 1405 , Code, of 1876, § 1703. So, in the act approved December 29, 1868, it was provided "that every railroad company in this State shall cause all its trains of cars for passengers to stop upon each arrival at a station advertised by such company as a station for receiving passengers upon such trains, at least one half of one minute." This is section 1721 of the Code of 1876 : section 1157 of the Code of 1886.

13

Railroads must have proper depot accommodations "at each of the passenger stations along the line of the railroad."—Sess. Acts, 1882–3, p. 154; 1886–7, p. 74; Code of 1886, § 1154.

The act creating a railroad commission for the State of Alabama was approved February 26, 1881—Sess. Acts, 84. Its title is, "To provide for the regulation of all railroad companies and persons operating railroads in this State." It was certainly intended to apply, and does apply to all railroads in the State, as the legislature understood that phrase. The powers it confers on the commissioners are comprehensive. They are embodied in the Code of 1886, §§ 1120 to 1143, inclusive.

To comment on all the statutory provisions relating to the railroad commissioners and their powers, which apparently shed light on the question we are now considering, would swell this opinion unduly. To be fully comprehended the entire statute must be read. Certain provisions of that statute, as well as many statutory provisions noted above, seem not to be properly adapted to street railroads, or dummy lines, which, as a rule, are constructed for the transportation of passengers for short and irregular distances. We will mention only some of the most striking provisions, in the enactment of which the legislature, it would seem, could not have intended their application to street railways, whether drawn by a dummy engine, or otherwise.

Section 1145 of the Code requires trains to be brought to a full stop before crossing another track. There could be no question that the difficulty, if not the impossibility of stopping an ordinary train of cars on an ordinary railroad within any short distance, and the consequent danger of a collision, supplied the motive of this enactment. That reason can not apply to a dummy engine and its train, which, under all the testimony, can be stopped in from ten to thirty feet.

Any one reading sections 1144, 1146, 1154, 1161, 1164, will readily perceive their inapplicability to street railways, even though drawn by a dummy engine. And it is not perceived how section 1148 can be made to apply to street railways.

If street railways, whose cars are drawn by dummy engines, are thereby constituted railroads under our general statutory system, then they must be brought under all the legislative enactments for the government of railroads. This will subject them not alone to the legislative provisions noted above. Its influence has a much wider sweep. They would cease to be taxable as the great bulk of property is taxed, but must be assessed under section 494 of the Code by the State board of assessment, with all the formality required in that section.

Does the reason which caused that enactment apply to street railways and dummy lines?

Again: If they are railroads under our statutes, they are under the power and jurisdiction of the railroad commission. Code, § 1129. They would be required to pay a license tax, and their share of the expenses of the railroad commission, to be ascertained by the auditor.—Code, § 1128. It would subject their tracks to supervision by the railroad commissioners, and require them to transport the commissioners free of charge. § 1129. Their tariff would be subject to revision by the commissioners.—§ 1130. Can it be possible that dummy lines are subject to the provisions requiring railroads to have "at each of the passenger stations along the line of its railroad . . sufficient sitting or waiting rooms . . . for passengers waiting for trains, having regard to sex and race, which shall be suitably heated in cold weather, and supplied with sufficient fresh drinking water, when passengers waiting for trains are present, and with sufficient and comfortable seats?" § 1154. Confining the legislation we are discussing to railroads proper, every clause in the fifty-four sections—1120 to 1173, inclusive—is germane and proper. Extending it so as to take in street railway service, no matter how propelled, we are forced to declare that many of the more important provisions of the statute are wholly unsuited to the new service assigned them. We are on safe ground when we give to the statutes such operation as the legislature had, and could only have had, in contemplation, when the statutes were enacted. We should hesitate before extending them to conditions essentially dissimilar.

The difficulties of interpretation extend farther than is suggested above. If street railways which employ dummy engines as motors are railroads, what are similar roads whose coaches are propelled by electricity, or by animal power? The tracks are alike, and the coaches, supported on flanged wheels, run only on the rails, as do the coaches of railroads proper. Are some street railways railroads under our statutory system, and others not? And if so, what class or classes are included, and what excluded?

But we are not left in doubt as to what the legislature intended. The statutory provisions in reference to the incorporation of railroads commence with section 1573 of the Code of 1886. There must be at least seven corporators, and the declaration must be filed with the Secretary of State.—§ 1574. The Secretary of State issues the commission to open books of subscription, § 1578, and keeps a record of it, § 1579. Such corporations have very many and large powers peculiar to

railroads proper, which are wholly inadapted to dummy lines. To state them in detail would swell this opinion to unreasonable dimensions. We invite attention to the following sections of the Code: 1580–1–2–3–6–7–8, 1594. And we also invite attention to Constitutional provisions.

Street railway companies are treated as a separate subject, and a chapter of the Code is devoted to it, commencing with section 1603. Five or more persons constitute the requisite number of subscribers to obtain such incorporation.—§ 1604. The judge of probate issues the commission for opening books of subscription—§ 1605—and the record of the proceedings is made and kept in his office.—§ 1607. The powers of the corporation are set forth in section 1608, and are essentially unlike those conferred on railroad corporations proper. These statutory provisions are, in several respects, unlike those theretofore in force. Code of 1876, §§ 1917, *et seq.*

At the session of the legislature 1886–7, before the publication of the Code of 1886, several of the statutory provisions found in the Code of 1876 were changed. By act approved December 10, 1886—Sess. Acts, p. 122—street railways were given the right to condemn private property to corporate purposes. By act approved February 25, 1887—Sess. Acts, p. 144—Sections 1918 and 1921 of the Code of 1876 were very materially changed. The language of these sections, before the amendment, authorized such incorporations only "in any of the cities or towns of this State." The amendment enlarged the privilege, and authorized the formation of such corporations "for the purpose of constructing and using a street railroad in, or in and near, or between any of the cities or towns of this State." This is, in point of time, the first legislative authority for constructing a street railroad outside of a city or town. It can not operate on any railroads except street railroads for its caption is, "To amend sections 1918 and 1921 of the Code," and those sections are in the article of the Code devoted exclusively to "street railroad companies." Any attempt, under that caption, to legislate on any subject other than that of the sections amended—street railroads—would render the enactment unconstitutional and inoperative.—*Ex parte Reynolds*, 87 Ala. 138; *Ex parte Cowert, supra*, p. 94.

There was a further amendment of sections 1917 and 1923 of the Code of 1876 by act approved February 28, 1887—Sess. Acts, 149. The effect of this amendment was to reduce the requisite number of subscribers, or promotors of a street railroad corporation from five to three. All of these enactments have special reference to street railroads, and can not, by the

most latitudinous construction, be made applicable to railroads in the larger sense.

It will be remembered that the collision which caused the death of plaintiff's intestate occurred February 22, 1889. Six days afterwards—February 28, 1889—the act was approved "To amend and enlarge the charter of the Ensley Railway, and to confer additional powers on said corporation. (Sess. Acts, 1020). That act, among other things, declares that "The Ensley Railway shall have and possess all the rights, powers, privileges and immunities, by the general laws of this State conferred on railroad companies." Why was that act necessary, or considered necessary, if the Ensley Railway was already a railroad, under the general laws of the State regulating railroads proper?

In the recent excellent work on Roads & Streets by Elliotts, pp. 530 and 557, et seq., there will be found a very full, and in many respects, an able discussion of the proper classification of street railways, which extend beyond city limits, and in some cases connect one city with another. That work, however, had mainly two aims in handling the question: First, to ascertain whether the construction of a street railway along a public street is the imposition of a new servitude, for which the owner of the ultimate fee is entitled to additional compensation; and, second, to what extent the use of steam as a tractor enters into the inquiry. The conclusion is reached that the street railways which employ only animal power impose no additional servitude, which justifies the demand of additional compensation, but if steam be used, then the increase of annoyance and danger consequent upon it calls for further damages. It is further stated, as a reason for a distinction, that street railways whose cars are moved only by animals are not clothed with any powers of eminent domain, whereas those which employ steam may condemn private property, for their use.

Eminent domain is purely an attribute of the sovereignty, and can be exercised alone by it, or by some person, natural or artificial, under legislative grant of the power. With the exception of a single provision for private roads in the Constitution of Alabama—Art. I, § 24—it is only in promotion of enterprises of a public nature that the sovereignty can exercise, or grant the power to another to exercise, the right of eminent domain.—Sadler v. Langham, 34 Ala. 311. Can it be maintained that street railways, even those extending from city to city, if their cars be moved by steam power, possess this element of public benefit which authorizes them to invoke and employ the sovereign power of eminent domain, while the less

pretentious horse or mule car can aspire to no such eminence? No person, natural or artificial, can assert the power of eminent domain, unless that power is conferred by legislative grant, and in some matter which has in itself an element of acknowledged public benefit. Can it be affirmed that street railways which employ steam as a motor possess that element, and that those which employ horses or mules do not? Is not the true inquiry, at last, whether the service accommodates the public with a ready and inexpensive means of transportation, within the area of customary business calls, and whether the legislature has conferred upon it the power of eminent domain?

We have traced this legislative history for the purpose of showing that from the inception two systems have been declared; one for the regulation of railroads proper, and the other for the regulation of street railways. That there is a natural, inherent, or organic difference in the two systems and their wants, we need scarcely assert. Is it not necessarily true, that if some of the provisions in reference to railroads apply to dummy lines, all must apply to them? By what statutory authority can we apply regulations to one which are designed for the other? And if we do so apply them, to what extent shall the application be made? Who shall determine this question, and by what criterion shall it be determined? Is it not safer to leave this delicate duty to the law-making power? It may be that it would be wiser and safer to require railroad trains to be brought to a full stop before crossing a dummy track. Let the legislature determine that grave question.

Whether, at the time of the injury complained of in this suit, the track of the Ensley Railway Company was a railroad, within the meaning of section 1145 of the Code, is a question on which the members of this court are not agreed.

It is contended by the majority of the court, as shown in Judge COLEMAN's opinion, that section 1173 of the Code tends to support their view. That section declares, that "unless clearly otherwise apparent from the context, the term, railroad company, as used in this chapter, includes any person or corporation owning or operating a railroad." I think that section has nothing to do with the question. My own opinion is that the only object of that section was to fasten responsibility on any person or corporation operating a railroad, whether such person or corporation owned the road or not. Under its provisions, any person having a cause of action traceable to the running of the road, or handling of its rolling stock, is not necessarily confined to the corporation as chartered, or to the

owner of the road for redress. He may proceed against any person or corporation operating the road, if the grievance complained of was suffered at the hands of such person or corporation, although not the owner of the track. It is common knowledge that railroads are sometimes operated under lease, and that two or more railroad companies sometimes, under an arrangement between themselves, use the same track for a part of their respective lines. Under this section of the statute, liability attaches to the particular person or corporation, whose breach of contract or tort is complained of.

My own opinion is that section 1145 of the Code is a strong argument in favor of my position. Under its terms, it is shown that it was not intended to apply to the Ensley Railway Company. This is "clearly apparent from the context." That section is part and parcel of the system established for the government of railroads proper, as we have heretofore shown. It is both preceded and followed by statutory provisions, which are palpably inapplicable to the Ensley railway, or any other dummy line. This is the context which makes it clearly apparent that the provisions of the chapter in which section 1145 is found do not and can not apply to the Ensley railway.

On the other hand, the Ensley railway was incorporated, not under the statutes devoted to railroads and their regulation, but under an amendment of the statutes devoted specially and separately to street railways and their regulation. How can the conclusion be resisted that the context clearly shows that none of the provisions, found in the system devoted to railroads proper, are applicable to street railways or dummy lines, which are chartered under and governed by an entirely different statutory system, with entirely different objects, powers, regulations and methods of service? If regulations enacted for railroads are applicable to street railways and dummy lines, why are not the regulations of street railways and dummy lines equally applicable to railroads proper? Should not the rule work both ways, to be consistent?

My own opinions are expressed above, and Judge CLOPTON concurs with me. The opinion of the majority of the court is expressed by Judge COLEMAN. According to that opinion, there is no error in the rulings of the Circuit Court, save the single one pointed out above.

COLEMAN, J.—The important question involved in this case is, whether the Ensley Railway Company is a railroad, within the meaning of section 1145 of the Code of 1886, which reads as follows: "When the tracks of two railroads cross each other, engineers and conductors must cause the trains, of

which they are in charge, to come to a full stop, within one hundred feet of such crossing, and not proceed until they know the way to be clear."

It is contended that this law does not apply to the Ensley Railway Company. The purpose of the statute was to guard against collisions at these crossings. Prior to the adoption of the Code of 1886, the distance within which trains were required to stop was fifty feet, and the distance was extended to one hundred feet on account of the difficulty of controlling the large engines and heavily loaded trains. The purpose of the statute, as we have said, is to prevent collisions, and the fact that some engines and trains, by reason of their structure and appliances are more easily managed than others, and may be stopped within a distance of twenty, thirty or fifty feet, is no reason why the law should not apply to them.

It may be conceded in argument there are many sections in the Code applicable to railroads, which do not and were not intended to apply to street railways. We hold that the Ensley Railway Company is not a street railway, within the meaning of the Constitution and the statutes which provide for the incorporation, organization and government of street railways, but that it is a "Railroad Company" within the meaning of section 1173 of the Code of 1886.

The constitutional provision is as follows : "No street passenger railway shall be constructed within the limits of any city or town, without the consent of its civil authorities." Code, p. 49, § 24. The statute laws pertaining to street railways are found in chapter 7, title 1, of the Code of 1886, beginning with section 1603 and ending with section 1612, and, so far as respects the question under consideration, are substantially the same as sections 1917 to 1929, inclusive, of the Code of 1876. Section 1603 of the Code of 1886 reads as follows : "Corporations for constructing, maintaining and operating street railways in a town or city may be formed in the mode prescribed, and have the capacity 'and powers in this chapter expressed." It is evident, from the Constitution and from this section and those which follow, that street railways here intended are only those to be formed, maintained and operated in a town or city. The phraseology of the law, the location, uses and purposes contemplated of street railways, and their subjection to municipal ordinance, lead to this conclusion.

The Ensley Railway Company is not included within this class of corporations or within the meaning of street railways, as defined by Elliot, in his excellent work on roads and streets. See pages 557–560. Its lines extend beyond municipal con-

trol, and its corporate existence, authority and powers are not derived from, or subject to municipal regulations. It was incorporated and organized by virtue of an act of the legislature adopted February 25th, 1887, p. 144. Until the adoption of this act, there was no law, which authorized the formation of a corporation like that of the Ensley Railway Company. The second section of the act reads as follows : "Section 2. Be it further enacted that section 1921 of the Code of Alabama, be amended so as to read as follows, namely Section 1921. Road located by authorities of cities or towns and counties; power to make and alter contracts. Such corporation shall have power to construct, maintain and use a street railroad upon the streets and upon the lines and between the termini named in the certificate, in any city or town upon such terms and in such manner as may be authorized by the ordinance or other lawful act of the proper authorities of such city or town, and upon any of the public roads of any county, upon such terms and in such manner as may be so authorized by the proper authorities of such county, and such railroad company may contract with such counties, cities or towns therefor, and the contract may be altered when both parties agree to the change." Before the adoption of this act, it must be admitted there were no street railways in the State, outside of the corporate limits of a city or town, and none were contemplated by the then existing laws.

A railroad organized under this act of the legislature, running beyond the corporate limits of any city or town and through counties, is not and necessarily can not be a street railway, within the meaning of the Constitution, and the provisions of the Code in regard to street railways. Except as to its termini it is entirely independent of municipal control. It derives its corporate powers and existence under the act of the legislature, after leaving the city boundaries, by contract with the counties through which it runs. There is no limitation to the extent of such a road. Under its provision a road could be constructed from Huntsville to Mobile—traversing the entire length of the State. There is no limitation upon the power and character of the propelling force, or the business to be conducted. It is common knowledge that railroads incorporated under this act, having in use heavy dummy engines, run from Birmingham to Bessemer City, and to other parts of the State, traversing wide scopes of country with regular stations, soliciting patronage, and competing with other railroads in carrying both freight and passengers. The very act itself, in the second section, no longer designates railroads organized under its provisions, after they leave the corporate

limits, as street railways, but as "Railroad. Companies." They are engaged in the same business as other roads, propelled by the same dangerous power of steam, and attended with the dangers incident to the operation of other railroads. Is there any reason why such roads should not provide comfortable depots for passengers in the country, and have their freight rates regulated, where they carry freight, and be taxed as other railroads, engaged in like business? Is there any reason why they should not be required to put up sign boards, and ring signal bells, and stop their trains at public road crossings and at railroad crossings, and observe all the safe-guards required of other railroads, to prevent collisions, and for the protection of human life? Is it reasonable to hold, that because of the structure of dummy engines, many of these regulations can be observed and complied with by those in control of them, more easily than other engines, therefore they shall not obey them at all? After leaving the city limits, as we have shown, they are no longer street railways, subject to municipal regulations, and if not railroads within the meaning of the general law, we may well enquire what kind of railroads are they, and by what laws are they governed? Can it be presumed that the legislature intended to provide for the incorporation of a species of railroad companies "*sui generis*," not subject to any law except the common law, for common carriers, while the duties and liabilities of all other railroad companies are regulated and controlled by statutory enactments?

We are of the opinion that the Ensley Railway comes directly within "Railroad companies," as defined by section 1173 of the Code of 1886, and which is as follows: "Section 1173. Meaning of Railroad Company. Unless clearly otherwise apparent from the context, the term, railroad company, as used in this chapter, includes any person or corporation owning or operating a railroad." This statute is broad and comprehensive. There is nothing in this section to indicate that the number of incorporators or the manner of the organization enters into the definition. The only exception is, where it is "clearly otherwise apparent from the context." We should say a horse car is not expected to carry a steam whistle, and for obvious reasons would be clearly excepted. Section 1145, which requires engineers and conductors to stop their trains where two railroads cross each other, is included in the chapter referred to in section 1173.

The act of February 28th, 1889, Sec. 1020, enlarging the charter and conferring additional powers on the Ensley Railway Co., strengthens our position. That act declares, among

other things, "The Ensley Railway Co. shall have and possess all rights, powers and privileges and immunities of the general laws of this State conferred on Railroad Companies." It must be admitted that this act, in no way, changes the character of the engines used, the business of the company, or creates a necessity for having depots, or the ringing of bells, blowing of whistles or stopping at public road crossings or railroad crossings, which did not exist before its passage. It can not be contended that the effect of this act was to change the relation of the road to the cities or towns in which are located its termini, or its relation to the county through which it passes, and the contract with the cities and county under which it was incorporated and organized. The number of incorporators and the mode of organization remains the same.

The act may have been passed out of abundant caution, or for some purpose not developed on this trial, but we can see no reason why the act of the Legislature should bring the Ensley Railway within the definition of "Railroad companies," as given in Sec. 1173, Code of 1886, *supra*, which did not exist prior to its passage. There was nothing in its incorporation, its motive power, its business and location to exclude it from this section. Whether the act of February 25th, 1887, is obnoxious to the constitutional provision of Article IV, § 2, which declares that "each law shall contain but one subject, which shall be clearly expressed in its title," is not determined, because it is not deemed necessary to a decision of the question before us. See *Ex parte Reynolds*, 87 Ala. 138; *Ex parte Cowert*, *supra*, p. 94.

After a careful consideration of the question, the majority of the court is of the opinion that the trial court did not err in holding that section 1145 of the Code applied to the Ensley Railway Company. The court is unanimous in all other respects.

Since writing the foregoing opinion we have been furnished with a certified copy of an opinion recently delivered by the Supreme Court of Tenn. (now in MSS.) in the case of *Katzenberger v. Lowe*, by Lurton J. In that case the Court holds that dummy engines, whether operated within or beyond the municipal limits, are subject to the general statutes regulating and prescribing duties for the government of railroads, to prevent accidents and injuries. The court uses the following language: "A train pulled by a small engine called a dummy, although exclusively engaged in carrying passengers, is a railroad within the meaning of the statute, prescribing precautions to be observed by railroads. The evil intended to be remedied pertains as much to this sort of railway as to the ordinary railroads of commerce." We cite the case as an authority

[Louisville & Nashville Railroad Co. v. Johnson.]

fully in accord with the conclusion reached by a majority of this court.

It is unnecessary for us to go further than the principles declared in our opinion *supra;* and consequently we express no opinion as to whether, under our statutes, dummy engines, operated wholly within and under municipal control, are subject to the general laws governing railroad companies, as defined in section 1173 Code of 1886.

Reversed and remanded.

*Action against Railroad Company for Damages, by Administrator of Person Killed.*

